UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

GOPAL KRISHNAPILLAI,

                      Plaintiff,

       -against-

PATRICK R. DONAHOE, Postmaster General,
United States Postal Service,

                Defendant.

-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**09-CV-1022 (NGG) (SMG)**

NICHOLAS G. GARAUFIS, United States District Judge.

       Plaintiff Gopal Krishnapillai brought this action in 2009 against his former employer,

Defendant Patrick R. Donahoe, Postmaster General of the United States Postal Service ("Postal

Service"), alleging pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16

("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 633(a) ("ADEA") that

he was subjected to discriminatory treatment due to his age, race, and national origin. Plaintiff

further alleges he was subjected to a hostile work environment based upon those same factors,

and that he was constructively discharged. Finally, Plaintiff also claims the Postal Service

violated the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq. ("Rehabilitation

Act"), by requiring him to undergo fitness-for-duty examinations.

       Defendant moves for summary judgment as to each claim. For the reasons below,

Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

       The following facts are taken primarily from the statements of facts submitted by the

parties pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1. Defendant

submitted its Statement of Undisputed Material Facts ("Def. 56.1" (Dkt. 47-1)); Plaintiff

submitted his Response to Defendant's Statement of Undisputed Material Facts ("Pl. Resp. 56.1"

(Dkt. 50)); and Defendant submitted a Consolidated Statement of Undisputed Material Facts

("Consolidated 56.1" (Dkt. 54-1)) that collected: "(1) the statements in the [Defendant's 56.1

Statement]; (2) the responses thereto set forth in Plaintiff's Response . . . (3) Defendant's replies

to Plaintiff's responses; (4) Plaintiff's supplement to his response; and (5) Defendant's responses

to those supplemental responses." (Consolidated 56.1 at 1.)

In these statements of facts and responses, the parties take frequent issue with each

other's characterizations, thus appearing to "dispute" certain facts that are not, in actuality,

disputed in the record evidence. Accordingly, the court will refer to the undisputed portions of

the statements of facts where possible, and will otherwise refer to the evidentiary source from the

record on summary judgment.

### A. Facts

#### 1. The Parties

Plaintiff was born in India on April 23, 1950, and was 54 years old when the events at

issue occurred. (Pl. Resp. 56.1 ¶ 1.) Plaintiff immigrated to the United States at the age of

twenty-four. (Decl. of Gopal Krishnapillai dated May 16, 2004 ("Krishnapillai Decl.") ¶ 5.) In

1986, Plaintiff began working for the United States Postal Service (the "Postal Service"). (Def.

56.1 ¶ 2.)

Silvia Glover and Timothy Lawson were Plaintiff's superiors at New Lots Station ("the

Station"). (Def. 56.1 ¶¶ 9-10.) Glover was Acting Manager and, as overseer of the Station's

operations, was Plaintiff's principal supervisor. (Id. ¶¶ 4, 9.) Glover was born in 1966. (Id. ¶

5.) Lawson was Acting Area Manager of a group of eight stations that included the New Lots

2

Station. (Id. ¶ 6.) As Acting Area Manager, Lawson was Glover's supervisor and also supervised Plaintiff on occasion. (Id. ¶ 6; Pl. Resp. 56.1 ¶ 10.) Lawson was born in 1964. (Def. 56.1 ¶ 7.)

Ronald Briggs, Nadia Chardiwall, and Tyjuana Ards were Plaintiff's colleagues at the Postal Service. (Id. ¶¶ 14; Lucas Decl. Ex. H (Defendant's Interrogatory Responses, response to interrogatory # 2).) Briggs was primarily responsible for overseeing letter carriers. (Def. 56.1 ¶ 14.) Briggs was born in 1963. (Id. ¶ 15.) Chardiwall and Ards also worked as carrier supervisors with the title of Acting Supervisor. (Lucas Decl. Ex. D (Briggs Dep.) at 24:24-26:9.) In 2004, Chardiwall was twenty-nine years old and Ards was either thirty-nine or forty years old. (Lucas Decl. Ex. H.)

### 2. Plaintiff's Employment at the United States Postal Service

The Postal Service employed Plaintiff from 1986 to 2006. (Def. 56.1 ¶¶ 2, 108.) Plaintiff was originally hired as a letter carrier (Krishnapillai Decl. ¶ 5), prior to being promoted to supervisor in 1991 (Def. 56.1 ¶ 2). In September 2002, Plaintiff was again promoted, this time to Supervisor of Customer Service. (Id. ¶¶ 2, 108.) In or about March or April 2004, Plaintiff began working at the New Lots Station in Brooklyn as Supervisor of Customer Services. (Id. ¶ 3.)

On or about September 20, 2004, Glover transferred to the Station. (Id. ¶ 4.) Shortly thereafter, Plaintiff approached Glover and asked her for the opportunity to work as the Station's carrier side supervisor. (Id. ¶¶ 4, 10.) At the time, Plaintiff was primarily involved with the financial side of the Station's operations; Plaintiff's duties and responsibilities included supervising approximately nine to eleven Postal Service clerks assigned to the customer service windows, interacting with customers, handling stamps, and tallying money received from

3

customers. (Id. ¶ 13.) Plaintiff, however, wanted to gain additional experience supervising carriers. (Id. ¶ 12.)

In fall 2004, Glover switched the responsibilities of Plaintiff and Briggs at the Station, making Plaintiff the carrier side supervisor and Briggs the customer side supervisor; Ards was also moved to the carrier side. (Id. ¶ 16.) Briggs provided Plaintiff one day of partial training in the carrier side function, but Plaintiff claims that Glover cut that training short and deprived Plaintiff of the opportunity to complete it. (Lucas Decl. Ex. A (Pl. Dep.) at 43:20-45:6.) Plaintiff also asserts that Glover not only allowed Ards to complete the carrier side training but that Glover personally instructed Ards. (Lucas Decl. Ex. B (Glover Dep.) at 86:3-8.) As a carrier side supervisor, Plaintiff's duties and responsibilities included ensuring that carriers properly sorted mail, supervising carriers as they removed and bundled sorted mail for delivery, and, on occasion, performing street supervision of carriers. (Def. 56.1 ¶ 18.)

Throughout 2004, Plaintiff believed that he performed his supervisory functions satisfactorily. (Id. ¶ 19.) However, Plaintiff received four disciplinary notices between September and December 2004: (1) a letter of warning in lieu of a seven-day suspension dated September 24, 2004; (2) a seven-day suspension dated October 27, 2004; (3) a fourteen-day suspension dated November 2, 2004; and (4) a fourteen-day suspension dated November 24, 2004. (Id. ¶ 20.) Plaintiff and Defendant debate whether or not these four disciplinary notices were actual or proposed. (Pl. Resp. 56.1 ¶ 20; Def. Reply to Pl. Resp. 56.1 (Dkt. 54-1) ¶ 20.) Regardless, Plaintiff served no formal suspension as a result of the disciplinary notices that he received. (Def. 56.1 ¶ 21.)

Plaintiff claims that the first direct evidence of his managers' hostility against his age occurred on October 2, 2004. (Lucas Decl. Ex. A at 129:5-8.) While speaking to Chardiwall,

4

Lawson pointed at Plaintiff and told Chardiwall: "Older people like him [i.e., Plaintiff] cannot function like you [Chardiwall]. That is why I brought you here." (Id.) Seventeen days later, on October 19, 2004, Glover stated: "[Plaintiff] is the one responsible for bringing the Station down." (Krishnapillai Decl. ¶¶ 27-30.) Plaintiff asked Glover why she was saying that he was responsible, and she replied: "That is why they sent me here—to fix the Station." (Id.)

### 3. Clock Rings

Employee productivity and the Station's budgeted hours are determined on a daily basis by a time entry system. (Def. 56.1 ¶¶ 23, 25.) As a supervisor, Plaintiff was required to correct time entry ("clock rings") errors made by the clerks—and, occasionally, by carriers—that he supervised. (Id. ¶¶ 22, 29.) Plaintiff was aware that one of his responsibilities was ensuring the accuracy of the clock rings. (Id. ¶ 29.)

In September 2004, Glover claims Plaintiff failed to correct clock ring discrepancies on a daily basis and, as a result, the Postal Service was unable to accurately measure the productively of its employees. (Id. ¶ 30.) Plaintiff denies he failed to correct clock ring discrepancies and claims he was not the carrier side supervisor responsible for correcting such discrepancies at that time. (Pl. Resp. 56.1 ¶¶ 28, 30; Krishnapillai Decl. ¶¶ 14, 24.) Glover issued Plaintiff a disciplinary notice dated September 24, 2004, relating to clock ring procedures. (Decl. of Silvia Glover, dated January 18, 2012 ("Glover Decl.") ¶ 7; Lucas Decl. Ex. A at 151:9-14, 19-21.) Plaintiff did not serve a suspension nor did he suffer loss of pay or benefits as a result of this discipline. (Def. 56.1 ¶ 34.) On October 20, 2004, Plaintiff was issued a letter of warning, with a one-year retention period, based on the September 24 discipline. (Id. ¶ 33.)

5

### 4. Disallowing Time

Supervisors are required by Postal Service regulation to adjust employees' clock ring entries consistent with the five-minute leeway rule.[1] (Krishnapillai Decl. Ex. D (Official Postal Service Time and Attendance Handbook, § 145.14).) Plaintiff and Defendant dispute whether supervisors had an additional practice, referred to as "disallowing time," of reducing the number of hours an employee recorded as worked in excess of the regular eight-hour workday, to avoid paying overtime, if the supervisors noticed that the employee did not actually work in excess of eight hours or was not authorized to work overtime. (Def. 56.1 ¶ 36; Pl. Resp. 56.1 ¶ 36.) Plaintiff and Defendant also dispute whether the Postal Service and, more specifically, Glover, instructed supervisors such as Plaintiff to discontinue the practice of disallowing time. (Def. 56.1 ¶¶ 37–38; Pl. Resp. 56.1 ¶¶ 37–38.)

On October 4, 5, and 8, 2004, Plaintiff disallowed employees' time of less than five minutes of unauthorized time. (Pl. Resp. 56.1 ¶ 39.) Chardiwall also made similar adjustments during the same time period. (Id.) On or about November 3, 2004, Plaintiff received a proposed seven-day suspension dated October 27, 2004, for allegedly failing to follow Glover's instruction to not implement the five-minute leeway rule. (Def. 56.1 ¶ 41.) Plaintiff maintains the discipline was issued for *not* violating his duty to apply the five-minute leeway rule to employees who went over their scheduled eight-hour shift by five minutes or less. (Pl. Resp. 56.1 ¶ 41.)

### 5. Badge Control

Supervisors can be assigned responsibility for ensuring that all first class mail has been removed from sorting cases prior to the letter carriers leaving the station for their routes. (Def.

---

[1]     The five-minute leeway rule, also known as the five-minute rounding rule, provides that "if (in the case of a full-time regular schedule employee) the clock ring totals for the tour are equal to or between 7.92 or 8.08 hour, the timekeeper should adjust the time to 8.00 hours.  This is known as the '5-minue rounding rule.'  Only work hours in excess of 0.08 hours (5 minutes) of the scheduled tour hours are considered overtime . . . ." (Krishnapillai Decl. Ex. D (Official Postal Service Time and Attendance Handbook, § 145.14).)

56.1 ¶ 45.) The Postal Service refers to this process as badge control. (Id. ¶ 46.) A supervisor performs badge control by collecting time cards from all carriers at the beginning of the tour and then checking the carrier's case before the carrier leaves the building to ensure that no mail has been left behind. (Id. ¶¶ 47–48.) Plaintiff was familiar with badge control procedures. (Id. ¶ 49.)

On the morning of November 2, 2004, Plaintiff was responsible for performing badge control. (Id. ¶ 52.) At 10:30 a.m., while several letter carriers were still in the Station, Glover told Plaintiff that she would assume responsibility for performing badge control and ordered him to leave the Station and perform letter carrier duties by delivering two plastic bins of mail. (Lucas Decl. Ex A at 169:6-170:24.) Plaintiff delivered the mail and returned to the Station at 12:30 p.m., at which time Glover gave him additional mail to deliver. (Id.) Plaintiff again delivered the additional mail. (Id. at 169:16-20.) Upon Plaintiff's return to the Station at 3:30 p.m., Glover accused him of being incompetent, as several pieces of mail were found in the sorting cases on the carrier side of the Station at 11:30 a.m.—approximately one hour after he had left the Station to deliver mail. (Lucas Decl. Ex. A at 174:16-21.) Plaintiff reminded Glover that he was not in the building at the time, to which Plaintiff asserts she replied, "[s]omeone has to pay the price." (Id.)

On or about November 3, 2004, Glover issued Plaintiff an additional discipline relating to Plaintiff's badge control responsibilities. (Def. 56.1 ¶ 55.) Plaintiff was not formally suspended from work and suffered no loss of pay or benefits as a result of the November 3 discipline. (Def. 56.1 ¶ 56.)

### 6.     Unattended Mail

To ensure the timely delivery of Priority and Express mail, the Postal Service requires that all such mail be dispatched on the last truck prior to the closing of a station. (Id. ¶ 59.) Before closing, the attending supervisors are responsible for checking the station to ensure that all outgoing mail, including Express and Priority mail, has been dispatched. (Id. ¶ 60.)

On the morning of November 2, 2004, two pieces of Express mail and seventeen pieces of Priority mail were found left at the Station overnight. (Id. ¶ 61.) Plaintiff had left work on November 1, 2004 at 5:00 p.m. (Lucas Decl. Ex. B at 132:19-133:5.) Glover claims she and Lawson reviewed surveillance videotapes to determine how the mail was left in the Station and that the footage showed Plaintiff and Briggs returning to the Station after having left for the day. (Id. at 131:14-141:17.)

On November 24, 2004, Glover issued proposed suspensions to Plaintiff (fourteen days) and Briggs (seven days). (Def. 56.1 ¶ 65.) Plaintiff was not suspended from work and suffered no loss of pay or benefits as a result of the November 24 proposed fourteen-day suspension. (Id. ¶ 69.)

### 7.     Plaintiff's Absences from Work

If a supervisor is absent from work due to an illness, to qualify for paid sick leave, the Postal Service requires that the supervisor submit a doctor's note or other acceptable evidence of incapacity to work. (Def. 56.1 ¶ 71; Pl. Resp. 56.1 ¶ 71.) If a supervisor fails to timely submit a doctor's note or other acceptable evidence excusing the absence, the Postal Service may classify the employee as absent without leave ("AWOL"). (Def. 56.1 ¶ 72.)

On Friday, November 5, 2004, while at work, Plaintiff complained of a headache and dizziness and asked to go home. (Id. ¶ 73.) Glover told Plaintiff she needed him at the Station.

(Id. ¶ 74.) Thereafter, Plaintiff complained of a headache, neck stiffness, and feelings of semiconsciousness. (Id. ¶ 75.) After Plaintiff's condition worsened, a postal clerk called an ambulance, and Plaintiff was taken to Brookdale Hospital. (Pl. Resp. 56.1 ¶ 75; Lucas Decl. Ex. A at 112:10-25.) While at the hospital, Plaintiff was evaluated and diagnosed with high blood pressure. (Def. 56.1 ¶ 77.) Plaintiff was advised by hospital staff to take Saturday off and to return to work on Monday, November 8, 2004. (Id.)

On November 8, 2004, Plaintiff reported for work between 7:30 and 8:00 a.m. (Pl. Resp. 56.1 ¶ 79.) Around 9:45 a.m., Glover told Plaintiff to go home and get better before coming back. (Lucas Decl. Ex. A at 197:5-18.) Shortly thereafter, Lawson called Plaintiff and told him that he needed to go home. (Id. at 197:13-18.) That same day, Plaintiff went to his personal physician, Bernard Yonk, M.D., to obtain additional medical clearance proving that he was able to return to work. (Pl. Resp. 56.1 ¶ 79.) Dr. Yonk arranged for medical testing to verify Plaintiff's fitness and wrote a doctor's note to excuse Plaintiff's absence until November 15, 2004. (Id.) That same evening, on November 8, 2004, Plaintiff's son, Madhu Pillai, brought Glover the doctor's note for one week's rest and a completed sick pay request form. (Id.)

By November 12, 2004, it was apparent to Plaintiff that the ordered test results would not be available by November 15, 2004. (Id.) Plaintiff requested and received a follow-up doctor's note notifying Defendant of the types of tests being performed and authorizing another week's rest until November 22, 2004. (Id.) Plaintiff's son returned to the Station and gave the follow-up note to Glover. (Id.) When Dr. Yonk's testing was complete, Plaintiff was cleared by a second physician to return to work with no restrictions. (Id.) Plaintiff returned to work again on November 22, 2004. (Id.) Glover informed Plaintiff that he could not remain at work until he produced a note clearing him to return to work. (Id.) Plaintiff went to Dr. Yonk's office and

returned that same day with a note authorizing him to work with no restrictions. (Id.) During this two-week period from November 8 to November 22, 2004, Glover initially placed Plaintiff on sick leave, but then re-classified his status as AWOL. (Def. 56.1 ¶ 80.)

Upon returning to work on November 22, 2004, Plaintiff claims that he was stripped of his regular duties and was instead assigned to walk the streets with carriers, and that Glover and Lawson denied him independent access to the Station by taking his keys and informed him that he would have to stay with Ards. (Lucas Decl. Ex. A at 110:14-18, 113:8-10, 129:14-17, and 243:4-11; Lucas Decl. Ex. B at 144:3-7; Lucas Decl. Ex. C (Lawson Dep.) at 153:16-21.)

On November 24, 2004, Glover ordered Plaintiff to work the next day—Thanksgiving, November 25, 2004. (Krishnapillai Decl. ¶ 65.) Those who work that holiday, as Plaintiff did, purportedly receive extra pay for their actual working time. (Id.) While Plaintiff received the eight hours of Thanksgiving holiday pay automatically given to all postal workers, he was not paid his regular wage for working that day, unlike Chardiwall, who also worked that day and was paid. (Id. ¶ 66.)

On December 3, 2004, Plaintiff claims Ards left the Station without fully closing up. Plaintiff claims that he remained at the Station until the postal police had been contacted and until Glover and Ards were eventually reached. Plaintiff maintains that Glover blamed Plaintiff and told him that he was "too old" and threatened to take his job, stating [sic throughout]: "You fucking ass . . . . You too old. You be looking for another job. Watch what is coming for you tomorrow ass." (Lucas Decl. Ex. A at 115:13-19.) Shortly thereafter, Plaintiff claims Ards told Plaintiff that his "time" as a postal supervisor had come and gone and threatened that Plaintiff's job would be taken from him: "You lose your job. Look for another job. I am in the Postal Service

10

for so many years. I am not losing my job. You lose it. This is my time." (Krishnapillai Decl. ¶ 80.)

### 8. Fitness-for-duty Examination

On or about November 12, 2004, Glover submitted a request to the Human Resources department to schedule Plaintiff for a fitness-for-duty examination. (Lucas Decl. Ex. B at 159; Ex. 15 (Helene Moor Kondek's EEO Affidavit) (response to Q5).) On December 1, 2004, Plaintiff was scheduled for a fitness-for-duty examination. (Def. 56.1 ¶ 86.) On December 6, 2004, Dr. Muataz Jaber, a physician under contract with the Postal Service, examined Plaintiff. (Id. ¶ 87.) Dr. Jaber met with Plaintiff for approximately five minutes. (Pl. Resp. Def. 56.1 ¶ 88.) Dr. Jaber concluded that Plaintiff was not fit for duty pending a mental fitness-for-duty examination. (Def. Rep. 56.1 ¶ 91.) Dr. Jaber referred Plaintiff to Dr. Robert Campion for a psychiatric evaluation and requested that Dr. Campion make a recommendation as to Plaintiff's ability to perform the function of his position and to work safely with others or the public. (Id. ¶¶ 89-90.)

On December 13, 2004, Dr. Campion, a psychiatrist, examined Plaintiff. (Id. ¶ 92.) On or about December 17, 2004, Dr. Campion found that Plaintiff could perform his job duties "under the right circumstances." (Pl. Resp. 56.1 ¶ 92.)

### 9. Administrative Leave and Disability Benefits

Administrative leave is absence from duty authorized by appropriate Postal Service officials without charge to annual or sick leave and without loss of pay. (Def. 56.1 ¶ 94.) The Postal Service has discretion in granting requests for administrative leave. (Id. ¶ 96.) Plaintiff requested administrative leave for the period that he was found not fit for duty by Dr. Jaber. (Id. ¶ 98.) The Postal Service denied Plaintiff's request for administrative leave. (Id. ¶ 99.)

11

Plaintiff subsequently applied for and was granted sick leave for the period that he was found unfit for duty. (Id. ¶ 100.) From December 6, 2004, through December 16, 2004, Plaintiff was permitted to use sick leave time for the days he was found not fit for duty. (Id. ¶ 101.) On December 20, 2004, Plaintiff was notified that he had been found fit for duty. (Id. ¶ 103.) Plaintiff was instructed to return to work the following day, December 21, 2004. (Id. ¶ 104.) Following his physician's direction of December 16, 2004, Plaintiff informed Glover on December 20, 2004, that he was sick and had sent a doctor's note. (Pl. Resp. 56.1 ¶ 105.) Plaintiff has not subsequently returned to work. (Def. 56.1 ¶ 106.)

On January 12, 2006, Plaintiff submitted to the Office of Personnel Management ("OPM") an application for a disability retirement benefits under the Federal Employees Retirement System ("FERS"). (Id. ¶ 107.) In his application, Plaintiff noted that he was unable to work and became disabled in December 2004. (Id.) On August 24, 2006, OPM approved his application. (Id. ¶ 108.) On August 28, 2006, Plaintiff retired from the Postal Service. (Id.)

Plaintiff also applied for and received benefits through the Social Security Administration ("SSA"). (Id. ¶ 109.) In Plaintiff's application for Social Security benefits, he noted that he became disabled on December 4, 2004 and was unable to work. (Id.) Specifically, Plaintiff noted in his SSA application that he became unable to work because of his disabling condition on December 4, 2004. (Id.) The SSA found Plaintiff disabled as of December 4, 2004. (Id. ¶ 110.)

## II.     PROCEDURAL HISTORY

On March 17, 2005, Plaintiff filed an Equal Employment Opportunity ("EEO") complaint. (Def. 56.1 ¶ 111.) On October 27, 2005, an Equal Employment Opportunity Commission ("EEOC") Administrative Judge ("AJ") issued a decision without a hearing, finding

that Plaintiff had failed to show that the Postal Service had discriminated against him on any basis. (Id. ¶ 112.) On November 25, 2005, the Postal Service adopted the EEOC AJ's findings and decision and issued a Final Order. (Id. ¶ 113.) Plaintiff appealed to the Office of Federal Operations, which in a decision dated July 3, 2008, reversed the agency's final action and remanded the matter to the agency to initiate a supplemental investigation. (Id. ¶ 114-15.)

On July 21, 2008, the EEO Services Analyst issued a "Remand Acknowledgment and Acceptance of Investigation (Revised Copy)." (Id. ¶ 116.) The issues accepted for investigation included Plaintiff's allegations of discrimination based on his race, national origin, color, and age, and whether he had been harassed and subject to a hostile work environment. (Id.) The case was later returned to the EEOC's judicial hearing office for further processing. (Id.) Plaintiff subsequently withdrew his request for an EEOC administrative hearing and filed this action on March 11, 2009. (Id. ¶ 117.) On November 11, 2012, Defendant filed with the court the fully-briefed motion for summary judgment. (See Dkts. 47-56.)

### III.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." Id. In reviewing a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. The movant bears the initial burden of demonstrating "the absence of a genuine issue of material

13

fact," and if that burden is satisfied, it then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. To show such evidence, the non-movant "may not rely on conclusory allegations or unsubstantiated speculation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a motion relies upon an affidavit, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); see Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008). "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Although summary judgment should be used "sparingly" where the material issue concerns an employer's intent, motivation, or state of mind, a "plaintiff must nevertheless offer concrete evidence from which a reasonable juror could return a verdict in his favor and is not

entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988) (citation and internal quotation marks omitted). Summary judgment in favor of a defendant may be appropriate where a plaintiff has submitted only conclusory allegations of discrimination. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

## IV. DISCUSSION

Plaintiff asserts claims under Title VII, the ADEA, and the Rehabilitation Act. He alleges that he was subject to adverse employment actions, constructive termination, and a hostile work environment.

### A. Discrimination

Under both Title VII and the ADEA, courts review claims of discriminatory treatment under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Woodman v. WWOR–TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005).[2] "Under this framework, a plaintiff bears the initial burden to establish a prima facie case of . . . discrimination by showing that (i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." Id. at 76. "A plaintiff's burden of establishing a prima facie case is de minimis." Abdu Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001). If a plaintiff establishes a prima facie case, the burden shifts to the defendant, who

---

[2]     Plaintiff does not present "direct" evidence of discriminatory treatment based on age. See United States v. Steele, 390 Fed. App'x 6, 7 (2d Cir. 2010) (endorsing the definition of "direct evidence" as "evidence that proves a disputed fact directly") (citation omitted); Sista v. DCD Ixis N. Am., Inc., 445 F.3d 161, 173 (2d Cir. 2006) (holding that the kinds of direct evidence potentially warranting a burden shift include "policy documents and evidence that may be viewed as directly reflecting the alleged discriminatory attitude"). The evidence presented by Plaintiff does not meet this standard, as more fully discussed below in the McDonnell Douglas burden-shifting analysis, which is appropriate where such "direct" evidence is absent. See Woodman, 411 F.3d at 76.

must offer a "legitimate, nondiscriminatory reason" for the challenged conduct. Woodman, 411 F.3d at 76. "If the defendant articulates such a reason, the presumption of discrimination drops out, and the plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 76 (citation and internal quotations omitted).

### 1. Prima Facie Case

The parties do not contest the first or second elements of the test set forth in McDonnell Douglas, 411 U.S. at 802-03. (See Def. Mem. (Dkt. 47-2) at 5.) Plaintiff is a member of protected classes under Title VII due to his race (Asian) and national origin (Indian), and Defendant makes no argument that he is not qualified for his position. Defendant instead contends that Plaintiff cannot establish the third and fourth elements of the prima facie case: that he suffered adverse employment action, and that Defendant's conduct gives rise to an inference of discrimination based on race, national origin, and/or age.

### a. *Adverse Employment Action*

"A plaintiff sustains an adverse employment action if he . . . endures a materially adverse change in the terms and conditions of employment." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quotations omitted). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (quotations omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id.

Plaintiff argues that his supervisors "shunned him, berated him, repeatedly made

16

knowingly false accusations of misconduct against him, humiliated him, undermined his authority, took away his Station keys and required him to 'stay with' the lower level employee being groomed to replace him, warned that he would soon be replaced by someone younger, and required him to undergo compulsory medical and psychiatric examinations." (Pl. Opp'n (Dkt. 49) at 1.)  More specifically, Plaintiff's opposition to summary judgment asserts that "he was denied sick pay for two weeks, he was forced to work substantial additional time without being paid for any of it, he was forced to take leave without pay, he was repeatedly disciplined and reprimanded, he was effectively demoted, and he was constructively discharged." (Id. at 38.)

In the context of adverse employment action analysis, Plaintiff's alleged embarrassment, humiliation, or depression, although distressing and unfortunate, did not impact the terms or conditions of his employment and are likewise not adverse employment actions. See Castro v. Mitchell, No. 09-CV-3754 (WHP), 2011 WL 10901797, at *4 (S.D.N.Y. Aug. 25, 2011). Similarly, the denial of administrative leave—in favor of allowed sick leave—does not impact the terms or conditions of employment and therefore is not an adverse employment action; it is undisputed that the grant of administrative leave is discretionary (Consolidated 56.1 Facts (Dkt. 54-1) ¶ 96), and the denial of its use in favor of sick leave when Plaintiff was declared unfit for duty does not rise to the level of an adverse employment action. Plaintiff received paid sick leave during the time he was absent from work in December 2004, and the denial of administrative leave in favor of the use of paid sick leave time did not impact the terms or conditions of his employment, as it caused no salary change, demotion, or other indicia of an adverse employment action. See Porter v. Donahoe, --- F. Supp. 2d ----, No. 10-CV-3297 (BMC), 2013 WL 4505409, at *6 (E.D.N.Y. Aug. 23, 2013) (finding that "the rejection of [plaintiff's] requests for leave on the terms he demanded—either administrative, or leave without

pay ('LWOP'), instead of sick leave and annual leave" did not constitute adverse employment actions) (collecting cases).

The court now turns to Plaintiff's remaining allegations, that he was subject to inappropriate discipline, improperly denied sick pay, required to work without pay, constructively demoted, and constructively discharged.

### i.    Written Disciplines

Plaintiff argues that the four written "disciplines" *themselves* constitute adverse employment actions. (Pl. Opp'n at 41-42.) He is incorrect. "Courts in this district have found that reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions." Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) (collecting cases). The disciplines may be a part of other alleged adverse employment actions, but they are not independent bases for a claim—as Plaintiff himself implicitly acknowledges in his explanation of "the clear link between the baseless disciplines and the adverse employment actions to which Plaintiff was subjected." (Pl. Resp. 56.1 ¶ 34.)

### ii.    Effective Demotion

Plaintiff alleges he was effectively demoted because he was excluded from a supervisor's meeting; made to perform the tasks of a mail carrier, a position below Plaintiff's; required to walk five or more hours a day checking addresses and walking with carriers; and had his Station keys revoked. (Pl. Opp'n at 43.) Plaintiff further alleges that he suffered a de facto demotion and a material diminution in responsibilities and in the terms and conditions of employment. (Id. at 43-44.)

The Second Circuit has described "demotion" sufficient to constitute an adverse employment action as being "evidenced by a decrease in wage or salary." Williams v. R.H.

18

Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "[T]o be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (internal quotation marks omitted).

Here, Plaintiff concedes his salary was not reduced (Pl. Opp'n at 44), and adduces no evidence of a less distinguished title or material loss of benefits. Indeed, Plaintiff does not allege actual demotion, but rather "effective" or "de facto" demotion. (Id. at 43-44.) Case law on "effective" demotion—without diminution of salary, title, or benefits—is sparse. Plaintiff cites two cases to support his position (Pl. Opp'n at 44), each of which involved a job *transfer*. See Rodriguez v. Bd. Of Educ., 620 F.2d 362, 365-66 (2d Cir. 1980); Gallo v. Second Taxing Dist. of City of Norwalk Operating Under Name of S. Norwalk Elec. & Water, 507 F. Supp. 2d 164, 173-74 (D. Conn. 2007); see also Kessler v. Westchester Cnty. Dept. of Soc. Servs., 461 F.3d 199 (2d Cir. 2006) (finding that a transfer to another office could, in the context of a claim for retaliation, be considered an adverse employment action). That is not the case here. The court declines to extend the concept of effective demotion to cover a situation where an employee is not subject to a change in salary, benefits, title, or location; accordingly, Plaintiff's effective demotion claim does not meet the requirements of an adverse employment action.[3]

---

[3] Although Plaintiff does not characterize the alleged employment action as "constructive demotion," the court notes that such a claim, even if cognizable, likely would be restricted to circumstances where "an employer imposes new conditions of employment and combines those conditions with a threat of termination for non-compliance." Tse v. UBS Fin. Servs., Inc., 568 F. Supp. 2d 274, 290 (S.D.N.Y. Feb. 19, 2008) (citing Kelly v. Metro-North Commuter R.R., No. 87-CV-5817 (JFK), 1989 WL 156298, at *8 (S.D.N.Y. Dec. 18, 1989) (finding that "forcing a choice" between discharge and a longer workday constituted a constructive demotion)); see also Dowling v. Prudential Ins. Co., No. 87-CV-2189 (JFK), 1988 WL 3418, at *2 (S.D.N.Y. Jan. 12, 1988) ("The Second Circuit has never adopted the constructive demotion theory. . . . [T]his Court finds that the constructive demotion theory could only be possible in this circuit if an employer had made conditions so unbearable that a reasonable person in the employee's shoes would have felt compelled to accept a demotion, rather than either remaining in his current position, or resigning."). As Plaintiff here ultimately did resign, the analysis otherwise appropriate for constructive demotion is applied to his claim for constructive discharge.

### iii. Denial of Sick Leave

Neither Plaintiff nor Defendant cites a case directly addressing whether the classification of Plaintiff as away without leave ("AWOL") during his absence from work for the period of November 8-22, 2004, rather than allowing him to utilize accumulated sick time—apparently, the difference between being paid or not paid for those two weeks—constitutes a material adverse employment action in a non-retaliation context under Title VII and the ADEA. Defendant does not mention this claim in the section of his motion for summary judgment addressing the definition of adverse employment actions, instead arguing that the fourth element of a prima facie case cannot be made—that Plaintiff cannot establish an inference of discrimination regarding denial of sick leave. (Def. Mem. at 6-7, 12-14.) Defendant's reply memorandum engages the issue, asserting that "Denial of Sick Leave Is Not an Adverse Action." (Def. Reply at 16-17.) But this heading introduces an argument that the action does not support an inference of discrimination; Defendant does not address whether the denial itself is an adverse action for purposes of the third element of the prima facie case. (Id. (stating that a later grant of sick leave "rebut[s] any claim that Glover discriminated against him by denying his request for sick leave in November").)

Moreover, in Figueroa v. N.Y. Health and Hosps. Corp., 500 F. Supp. 224, 234 (S.D.N.Y. 2007), which Defendant cites in its motion in the context of administrative leave (Def. Mem. at 7-8), the court found that *even where plaintiff was later reimbursed for initially-denied sick leave*, "for the purposes of this [summary judgment] motion, we shall assume that the initial denial of sick leave is sufficient to meet the third prong of a [Title VII] prima facie case." Notably, although the Figueroa ruling relied in part on a Supreme Court decision that applied the lower standard involved in retaliation-based Title VII claims, the Figueroa court itself analyzed a

20

non-retaliation Title VII case. Id. (citing Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).

Plaintiff asserts there is "no dispute that denial of sick leave constitutes a material adverse employment action" but cites no cases in this circuit directly supporting this argument. However, as some of Plaintiff's cited authorities note, it is true that some Second Circuit courts have found that the denial of use of sick time can be considered an adverse employment action in the context of a retaliation claim under Title VII. See Rolon v. Ward, No. 05-CV-0168 (WCC), 2008 WL 4700705, at *22 (S.D.N.Y. Oct. 24, 2008) (finding that if "plaintiff lost sick leave days as a result of defendants' wrongful charging of sick leave days, this could constitute an adverse employment action" under a retaliation analysis); Pfeiffer v. Lewis County, 308 F. Supp. 2d 88, 109 (N.D.N.Y. 2004) (holding that the denial of plaintiff's application to use sick bank leave time constituted an adverse action in support of plaintiff's retaliation claim).

The court acknowledges that the standard for "adverse employment action" is different— and easier to meet—in the context of a retaliation claim under Title VII. See Dillon v. Morano, 497 F.3d 247, 254 (2d Cir. 2007) ("the proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights'") (citation omitted). But given the significant effects of denying an employee the use of paid sick time or administrative leave during a medical absence, the court finds that this is sufficient to establish an adverse employment action.

iv.    Constructive Discharge

Finally, a constructive discharge is an adverse employment action. Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001). "An employee is constructively discharged when

his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003) (citations omitted). "To find that an employee's resignation amounted to a constructive discharge, the trier of fact must be satisfied that the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Fitzgerald, 251 F.3d at 357-58 (quotations and alterations omitted). "A constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments," that "the employee feels that the quality of his work has been unfairly criticized," or that the "employee's working conditions were difficult or unpleasant." Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993).

Plaintiff's allegations, while unfortunate, are insufficient to establish an issue of triable fact on the claim of constructive discharge. "An employee is not constructively discharged because she does not like her assignments, receives unfair criticism, or is yelled at by supervisors." Katz v. Beth Israel Med. Ctr., No. 95-CV-7183 (AGS), 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) (citing Stetson, 995 F.2d at 360). Indeed, the Second Circuit "has strictly construed the standard for determining whether working conditions are intolerable . . . noting that the appropriate test is not 'merely whether the employee's working conditions were difficult or unpleasant.'" Stembridge v. City of New York, 88 F. Supp. 2d 276, 284 (citing Spence v. Maryland Casualty Co., 995 F.2d 1147 (2d Cir. 1993)).

Notably, there is no dispute about the fact that Glover instructed Plaintiff to return to work after he was declared fit for duty. (Pl. Opp'n at 17.) This fact overwhelmingly suggests that Plaintiff's supervisor was not attempting to force Plaintiff to resign. See Stembridge, 88 F. Supp. 2d at 284 (describing as a "key issue" the question of "whether plaintiff's employers

deliberately created unbearable working conditions for the purpose of forcing plaintiff to resign")
(citation omitted). Indeed, the cases cited by Plaintiff to support his argument for constructive

discharge (Pl. Opp'n at 45-46) included evidence of blatant attempts to force plaintiffs to resign.

See Kirsch v. Fleet St., Ltd., 148 F.3d 149, 162 (2d Cir. 1998) (noting "(uncontroverted)

testimony that Alan Haber nodded in response to [a] statement that the company was trying to

force [plaintiff] to leave"); Gonzalez v. Bratton, 147 F. Supp. 2d 180, 198 (S.D.N.Y. 2001)

(where plaintiff testified she was explicitly "told she would be fired after the [disciplinary]

proceeding and that she would have to sign the [resignation] form in order to be allowed to

resign rather than being fired for cause"). Here, conversely, it is undisputed that Plaintiff was

instructed to return to work, and the small number of vague statements Plaintiff inferred as

threatening his employment, even if true, do not establish a triable issue of material fact on the

issue of constructive discharge—nor do the unfair criticisms or difficult or unpleasant working

conditions.[4]

### v. Unpaid Wages For Extra Time Worked

Plaintiff asserts that he worked approximately 2-4 additional hours each day without

being paid and claims "there is . . . no dispute that such non-payment of wages constitutes a

material adverse employment action." (Pl. Opp'n at 40.) However, Plaintiff cites just a single

case in support of his argument, and it is inapposite. See Mason v. Mitchell's Contracting Serv.,

LLC, 816 F. Supp. 2d 1178 (S.D. Ala. 2011) (finding that sending an employee home without

pay for the day due to slow business is an adverse employment action). Unlike the plaintiff in

---

[4]      Defendant argues that Plaintiff's constructive discharge claim must fail because Plaintiff failed to
administratively exhaust it and because that claim is estopped by Plaintiff's successful application for disability
retirement benefits. Because Plaintiff cannot establish a prima facie case for constructive discharge, the court need
not reach these arguments. Nor does the court need reach the question of whether the length of time between
Plaintiff's last day at work and his resignation would preclude any finding of constructive discharge. See Katz,
2001 WL 11064, at *11-12.

that Southern District of Alabama case, Plaintiff here was paid for the days he worked. Moreover, there is only "non-payment of wages," as Plaintiff alleges (Pl. Opp'n at 40), if Plaintiff was entitled to payment for that time. Plaintiff makes no specific argument that he was a non-exempt hourly employee entitled to pay for overtime work.

There is scant record evidence on this issue, and neither Plaintiff nor Defendant cites significant evidence to support their contentions. (See Pl. Opp'n at 40; Def. Reply at 18.) At least one authority suggests that postal supervisors are not entitled to overtime. See Oldham v. U.S. Postal Serv., No. 3:06–0945, 2010 WL 1169769, at *5 (M.D. Tenn. Mar. 24, 2010) (finding a supervisor not entitled to overtime under certain circumstances, in an FLSA action), aff'd, 465 Fed. App'x 440 (6th Cir. 2012). Plaintiff asserts only in the most conclusory fashion that he was entitled to extra pay for his additional hours, but does not claim that he was an hourly employee or that he would be entitled to such extra pay even as a salaried employee. In short, Plaintiff adduces no evidence that he was entitled to the compensation whose denial he claims was an adverse employment action. Moreover, even if Plaintiff were entitled to overtime pay under some conditions, its denial under these limited circumstances would not constitute a materially adverse change in the terms and conditions of employment.

Regarding the Thanksgiving Day payment specifically, Plaintiff does at least assert that "all postal employees receive one day of holiday pay, and the very few who actually work that day receive extra pay for their actual working time." (Pl. Opp'n at 13.) However, Plaintiff cites no evidence to support his assertion that "all postal workers" who work on Thanksgiving receive double pay. (Id.) Nor does the fact that Chardiwall received such pay establish either an adverse employment action or an inference of discrimination, as Chardiwall is a non-management, bargaining unit employee and not similarly situated to Plaintiff. (Pl. Opp'n at 18 n.11.) For all

24

these reasons, Plaintiff cannot establish the third element of a prima facie case as to unpaid wages for extra time worked.

In sum, Plaintiff can establish an adverse employment action regarding the denial of sick leave usage, but not for any of his other claims.

### 2. Inference of Discrimination

Although Plaintiff can establish that the denial of sick leave may be an adverse employment action, he cannot satisfy the fourth element—an inference of discrimination. Regarding Plaintiff's race and national origin claims under Title VII, he sets forth no material evidence whatsoever that his employer discriminated against him on those bases, much less that any such discrimination formed a nexus with an adverse employment action. Plaintiff's race and national origin claims are the kind of mere conjecture and speculation that are wholly insufficient to create a genuine issue of fact. See Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). As Defendant notes, Plaintiff's opposition to Defendant's motion for summary judgment does not in substance address his claims of race and national origin discrimination. (Def. Mem. at 13 n.5.) Rather than ruling that Plaintiff has abandoned these claims, however, the court simply finds that Plaintiff's race and national origin allegations are without evidentiary merit.

Plaintiff does put forth some evidence to support his age discrimination claims, but it is insufficient to establish an inference of discrimination on the issue of denied sick leave. Plaintiff cites three statements he asserts evince discriminatory animus, none of which provides the necessary nexus to the adverse employment action—the denial of sick leave—to establish an inference of discrimination on that claim. Crucially, the most significant evidence of age discrimination, in which Glover allegedly told Plaintiff, "You fucking ass . . . you['ll] be looking

25

for a new job . . . You['re] too old," occurred on December 3, 2004—three weeks *after* Glover

switched Plaintiff's classification from sick to AWOL for his November absence. See Almonord

v. Kingsbrook Jewish Med. Ctr., No. 04-CV-4071 (NGG), 2007 WL 2324961, at *9 (E.D.N.Y.

Aug. 10, 2007) ("In the absence of a clearly demonstrated nexus to an adverse employment

action, stray workplace remarks are insufficient to defeat a summary judgment motion." (citing

Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998))).

Similarly, the other remark implicating Plaintiff's age was made by Lawson on October

2, 2004: "Older people like him [Plaintiff] cannot function like you [another worker]. That is

why I brought you here." (Pl. Resp. 56.1 ¶ 67.) Even taking Plaintiff's facts in the light most

favorable to him, this comment was made more than a month before the adverse employment

action, and was made by *Lawson* to Chardiwall; in other words, Glover—who made the decision

regarding sick leave—had nothing to do with the comment.

Finally, Plaintiff attributes the following statement to Glover on October 19, 2004,

"[Plaintiff] is the one responsible for bringing the Station down. That is why they sent me

here—to fix the Station." (Pl. Opp'n at 27.) Again taking Plaintiff's facts in the light most

favorable to him, it was Glover who made the statement, and it was within the month prior to the

adverse employment action. But it shows no independent discriminatory animus or intent

concerning Plaintiff's age. No reasonable factfinder could infer discrimination exclusively from

this comment, even were there some nexus with the adverse employment action taken nearly a

month later. Plaintiff asserts that Glover reclassifying Plaintiff's time from sick leave to AWOL

creates a material issue of fact as to Defendant's motive (id. at 66), but other than this conclusory

assertion, Plaintiff does not and cannot connect the denial of the use of sick leave to—and

therefore establish a nexus with—any discriminatory motive or intent.

26

Plaintiff also seeks to establish an inference of discrimination by demonstrating that similarly situated employees outside Plaintiff's protected class were treated more favorably under analogous circumstances. He cannot. "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citation omitted). This includes whether Plaintiff was subject to the same workplace standards and whether the conduct for which the employer imposed discipline was of comparable seriousness. Graham v. Long Island. R.R., 230 F.3d 34, 40 (2d Cir. 2000). Plaintiff claims that comparators Chardiwall and Ards were not "deprived of the ability to utilize the USPS sick leave program," citing Plaintiff's Responses to ¶ 80 of Defendant's Rule 56.1 Statement. (Pl. Opp'n at 36.)

It is questionable whether Chardiwall and Ards were similarly situated comparators, but even assuming they are, Plaintiff makes no argument—or even mention—of any sick leave grants, denials, or practices regarding any other employee. There is no evidence of an employee being granted sick leave where there is a dispute over the timing of a request, nor any evidence that another employee received more favorable treatment relating to a sick leave request. For example, in a case cited by Plaintiff in his argument that sick leave constitutes an adverse action (Pl. Opp'n at 39), the court found an inference of discrimination based on comparator evidence where coworkers were *granted* sick leave under circumstances similar to those in which plaintiff was *denied* sick leave. See Childs-Pierce v. Util. Workers Union of Am., 383 F. Supp. 2d 60 (D.D.C. 2005). There is no such evidence here.

Accordingly, for the reasons set forth above, Plaintiff is unable to establish a prima facie case of discrimination under Title VII or the ADEA, and Defendant's motion for summary judgment is granted as to those claims.

27

### B.    Hostile Work Environment

Title VII "does not set forth a general civility code for the American workplace." White, 548 U.S. at 68. "In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) (quotation marks and citation omitted).  A determination of hostile work environment is based on the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. The same standards apply under the ADEA. Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003).  While the law requires that the incidents of alleged harassment be "severe or pervasive," this does not mean that an employer may be held liable only in "the most egregious cases." Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997).  "Any relevant factor may be taken into account, [but] no single factor is required." Mills v. George R. Funaro & Co., No. 99-CV-4816 (LAP), 2001 WL 50893, at *10 (S.D.N.Y. Jan. 19, 2001) (alteration in original) (citation omitted).

Although the standard for establishing a hostile work environment claim is high, the Second Circuit has "repeatedly cautioned against setting the bar too high, noting that '[w]hile a mild, isolated incident does not make a work environment hostile,' the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" Terry, 336 F.3d at 148 (citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000) (emphasis in original)).  Notably, the

standard for establishing a hostile work environment is lower than that for establishing constructive discharge. See Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 251 (S.D.N.Y. 2001).

As discussed above, Defendant correctly argues that many of the actions alleged by Plaintiff do not specifically provide individual grounds for a discrimination claim under Title VII or ADEA. However, those actions may be considered collectively in the larger context of a hostile work environment claim. The Second Circuit has allowed hostile work environment claims to survive summary judgment even where "each incident on its own may not have been particularly severe" because "a work environment may be actionable if the conduct there is *either* so severe *or* so pervasive as to alter the working conditions of a reasonable employee." Terry, 336 F.3d at 149 (citation omitted) (emphasis in original). Indeed, the Second Circuit in Terry considered as relevant to a hostile work environment claim, allegations of a supervisor telling co-workers not to speak to the plaintiff and telling co-workers that plaintiff was "nuts." Id. at 148. Where there is evidence that a work environment is made "unusually and unnecessarily unpleasant on a nearly daily basis," and where "a reasonable fact-finder crediting [plaintiff's] testimony could find that the harassment was sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and to create an abusive working environment," a hostile work environment claim may lie. Id. at 149.

Here, following many years of apparently excellent professional service to the Postal Service, Plaintiff was—taking his evidence in the light most favorable to him—repeatedly and regularly harassed, belittled, unfairly criticized and reprimanded, forced to do sub-supervisor tasks, and denied the use of sick and/or administrative leave time. This goes well beyond "vague claims of rude behavior," as Defendant characterizes it. (Def. Opp. at 21.) The speed with

29

which these incidents occurred following Glover's arrival at the office and their sheer frequency over the course of three months raises at least an issue of triable fact in terms of altering the conditions of Plaintiff's employment to create a hostile work environment.

Of course, Plaintiff must adduce sufficient evidence to create an issue of material fact regarding whether Defendant's alleged hostility was based on a prohibited consideration. As explained above, there is no evidence of any race or national origin discrimination. Accordingly, Plaintiff's hostile work environment claim under Title VII is unavailing. However, taking his evidence in the light most favorable to him, Plaintiff has put forth evidence of age-related motivation. Glover's specific comment regarding Plaintiff's age, made as Glover cursed at Plaintiff and threatened his job, could allow for a reasonable person to find that the incidents described by Plaintiff were based on his age. Moreover, Glover's statement so soon after arriving at the office—less than a month—that Plaintiff was "responsible for bringing the Station down" raises the possibility that Plaintiff, until that point an accomplished and capable employee of many years, was being targeted for reasons other than his allegedly poor performance. As discussed above, these comments do not establish an inference of discrimination specifically regarding the adverse employment action of denial of sick leave; nevertheless, in the broader context of incidents, and relieved of the requirement of establishing a nexus with one specific act, they add to a record that could allow for a rational trier of fact to find age-related discrimination pursuant to a claim of hostile work environment.

The cases cited by Defendant to show that a few remarks referencing the protected category cannot establish a hostile work environment claim generally involve isolated or episodic incidents unconnected to the kind of pattern of harassment for which there is evidence here. (See Def. Reply at 27-28.) Defendant also argues that Glover and Lawson dispute that

30

they made the statements attributed to them by Plaintiff. (Def. Mem. at 23; Def. Reply at 12.) But that hardly means there is no disputed issue of fact as to Plaintiff's hostile work environment claim.

Indeed, the court must be "especially chary in handing out summary judgment in discrimination cases." Whidbee, 223 F.3d at 71 (citing Chertkova v. Connecticut Gen. Life Ins., 92 F.3d 81, 87 (2d Cir. 1996)). Accordingly, the court concludes that there is a triable issue of fact as to whether Plaintiff endured a hostile work environment because of his age.

### C.     Rehabilitation Act Claim

Plaintiff asserts that the Postal Service violated the Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq., when it requested that Plaintiff undergo a fitness-for-duty examination following his return from a two-week illness-related absence. (Pl. Opp'n at 60.) In particular, the Rehabilitation Act bars employment discrimination due to an individual's disability, id. § 794(a), and provides that the standards for determining violations are the same as under the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq., and 42 U.S.C. §§ 12201-04 and 12210 ("ADA"). See 29 U.S.C. § 794(d); Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999) (explaining that the ADA and Rehabilitation Act "impose identical requirements"). The ADA requires that for an agency to permissibly require a medical examination of an employee, it must show that the examination is job-related and consistent with business necessity. Gajda v. Manhattan and Bronx Surface Transit Operating Auth., 396 F.3d 187, 188 (2d Cir. 2005).

Courts "will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." Conroy v. New York State Dept. of Corr. Servs., 333 F.3d 88, 98 (2d Cir. 2003). The employer need not show that the examination

or inquiry is the only way of achieving a business necessity, but only that the examination or inquiry must be a reasonably effective method of achieving the employer's goal. Id.

Plaintiff essentially asserts the paradoxical argument that although he was disabled and/or unfit for duty as of December 4, 2004—the disability onset date for his Social Security Disability benefits—it was outrageous and illegal for his supervisors to schedule him for a fitness-for-duty examination on November 29, 2004 (which eventually occurred on December 6, 2004). Plaintiff acknowledges that on November 5, 2004, he "fell into a semi-conscious state" and "was transported to the hospital via ambulance, with his blood pressure spiking." (Pl. Opp'n at 8-9.) Plaintiff ultimately was out from work for two weeks, as instructed by his physician. (Id. at 10.) Within a week, he was instructed to attend a fitness-for-duty examination.

Plaintiff asserts that the examination was harassment, but, despite the existence of a material issue of fact as to his claim of a hostile work environment, there is no evidence specifically tying the fitness-for-duty examination to discriminatory animus. Accordingly, Plaintiff is unable to establish a claim under the Rehabilitation Act.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED as to Plaintiff's discrimination and hostile work environment claims under Title VII and his claims pursuant to the Rehabilitation Act, and DENIED as to Plaintiff's claim of a hostile work environment under the ADEA.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
September 25, 2013

NICHOLAS G. GARAUFIS
United States District Judge

32